**SIGNED this 30th day of September, 2019**

_____
Shelley D. Rucker
UNITED STATES BANKRUPTCY JUDGE

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER

In re:
David Mark Poole                                          No. 4:16-bk-12638-SDR
Mary Louise Poole                                         Chapter 13
      Debtors;

**MEMORANDUM**

This case is pending before the court on the objection to confirmation of the debtors' Chapter 13 plan filed by creditor First National Bank of Middle Tennessee ("FNB"). The court previously overruled FNB's objection and confirmed the debtors' plan. [Doc. Nos. 40-41, 57]. FNB had argued that the debtors' plan impermissibly modified its rights under 11 U.S.C. § 1322(b)(2) by proposing to bifurcate a single mortgage securing three notes into secured and unsecured claims. On January 30, 2017, the court entered a memorandum opinion and order overruling FNB's objection. [Doc. No. 40-41; *In re Poole*, No. 4:16-bk-12638-SDR, 2017 WL 401799 (Bankr. E.D. Tenn. Jan. 30, 2017)]. Applying the statutory definitions found in the

Bankruptcy Code, the court determined that the three notes created three separate obligations for the debtors to pay FNB specific amounts. [*Id.* at *3]. The court thus determined that FNB held three claims. When the court examined each debt, it looked to the definition of a lien in the Bankruptcy Code to determine whether there was a right to charge the property to secure the payment or performance of that debt. [*Id.*]. Finding that each debt included a charge against an interest of the debtors' property, the court found that there was a lien for each debt. [*Id.*]. Thus, the court found that FNB held three liens as defined in the Bankruptcy Code securing three notes and that two of the liens had no value.

Applying 11 U.S.C. §§ 506(a)(1) and 1322(b)(2), the court found that FNB held a secured claim that could not be modified with respect to the first note because there was value in the property to support the lien. [*Id.* at 3-5]. However, with respect to the second and third claims representing the second and third notes, respectively, there was no remaining value in the property to support the lien. [*Id.* at 5]. Thus, the court held that the debtors could modify the terms of the second and third notes and treat them as unsecured in the plan. [*Id.*]. Accordingly, the court denied FNB's objection and confirmed the debtors' Chapter 13 plan. [*Id.*].

FNB appealed. On appeal, despite the fact that the debtors did not file a responsive brief, the district court initially affirmed this court's orders overruling the objection and confirming the plan. [Case No. 4:17-cv-8 (E.D. Tenn.), Doc. No. 22]. FNB filed a motion for rehearing in the district court, which was also unopposed by the debtors. [*Id.* at Doc. No. 24]. In an order entered October 24, 2018, the district court granted in part the motion for rehearing, vacated its judgment affirming the bankruptcy court, and remanded the case to the bankruptcy court.

On remand, this court was instructed to consider two arguments that FNB made for the first time on appeal: (1) whether Tennessee state law applies to the question of how many liens

2

FNB has on the property; and (2) if Tennessee law is applied, whether FNB has one lien on the property or three. [*Id.* at Doc. No. 29, p. 4]. FNB contends that once Tennessee law is applied to its mortgage documents, it has only one lien. FNB further contends that, if it has only one lien securing all three notes, then its lien is supported by value and its rights cannot be modified.

After reviewing the pleadings and briefs filed in this case, the record as a whole, and the applicable law, the court finds that there is only one lien, but it provides no value to FNB's second and third claims. Therefore, the court finds that FNB holds one secured claim represented by Note One and two wholly unsecured claims represented by Note Two and Note Three, respectively. The two wholly unsecured claims may by modified.

### I. Jurisdiction

The court has jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(K) & (L) to hear and determine this matter.

### II. Facts

The relevant facts are not in dispute and are summarized below.[1] The debtors own real property, which is their principal residence. The parties stipulated that the value of the property is less than $44,000.[2] FNB made three loans to the debtors. The first loan ("Note One") is evidenced by a promissory note dated April 26, 2005, in the original principal amount of $61,232.08. Note One's current balance is $44,751.92. Note One is secured by real estate described in the deed of trust executed on April 26, 2005, and recorded on April 29, 2005, at Book 126, Page 649-653 in the Warren County, Tennessee, Register of Deeds Office ("Deed of Trust"). [Claim 2-1, at 17-21].

---

[1] The facts are set out in more detail in the court's prior opinion. [Doc. No. 40; *In re Poole*, 2017 WL 401799, at *1-2]. No additional evidence was added to the record on remand.

[2] The parties agreed to this value for purposes of FNB's objection on the issue of bifurcation. The parties reserved the right to hold a hearing on valuation in the event that the court overruled FNB's objection as to bifurcation. [Doc. No. 37, at 2 n.1].

The Deed of Trust reflects that it was given to secure all obligations owed to FNB. [*Id.* at 18]. It refers specifically to the obligation due under Note One under the heading "Present Indebtedness." [*Id.*]. It also states under a heading titled "Open-End Mortgage Clause" that:

> In addition to the above-described indebtedness, this Deed of Trust shall, and does by these presents, secure: (1) any and all existing indebtedness or other obligations of the Borrowers, or either of them, now held by Lender, any and all extensions and renewals thereof regardless of amount or maturity, including the above-described indebtedness, and (2) any and all future indebtedness or other obligations regardless of amount or maturity which may hereafter be created by the Borrowers, or either of them, and be held by Lender, together with any and all extensions and renewals thereof regardless of amount or maturity, with a period of twenty (20) years from date up to an amount not exceeding $61,232.08, whether said indebtedness or other obligation is evidenced by note or notes, draft, check, guaranty or otherwise.

[*Id.*]

In the event of a default, the Deed of Trust authorizes the trustee to sell the property and apply the proceeds, first, to pay the costs and expenses of executing the trust; then, to the debt described as the "Present Indebtedness;" and, finally, to all other debts including those obligations referred to under the "Open-End Mortgage Clause." [*Id.* at 20-21]. There is no priority assigned between the other obligations referred to under the "Open-End Mortgage Clause."

The debtors and FNB subsequently undertook a series of transactions on June 19, 2015. The parties executed a "Change in Terms Agreement" with respect to Note One, which then reflected a principal indebtedness of $43,535.97. [*Id.* at 10]. The debtors and FNB also executed a second promissory note on June 19, 2015 ("Note Two"), in the original principal amount of $5,723.80. [*Id.* at 12]. A third note ("Note Three") was executed at the same time in the original

principal amount of $6,431.56.[3] [*Id.* at 14]. Note Two and Note Three each recite that they are secured by the same real estate described in the Deed of Trust. [*Id.* at 12, 14].

Also on June 19, 2015, the debtors and FNB executed a "Modification and Extension Agreement" to Note One (the "Modification"). [*Id.* at 23]. In the Modification, the debtors acknowledge the loan is evidenced by Note One and the Deed of Trust. [*Id.*]. The Modification extends the statute of limitations for enforcement of the Deed of Trust by ten years. [*Id.* at ¶ 1]. The Modification deletes the original paragraph in the Deed of Trust entitled "Present Indebtedness" and substitutes the following:

> To secure a debt evidenced by a certain note, which may be modified from time to time, dated the 19th day of June 2015, in the original principal amount of $43,535.97, executed by David Poole and wife, Mary Poole, payable to the order of First National Bank of McMinnville, Tennessee, (designated "Lender" which expression shall include its successors and assigns) the same bearing interest to which note reference is here made and the terms and conditions of which are incorporated by reference.

[*Id.* at ¶ 3].

The Modification also deletes the paragraph entitled "Open-End Mortgage Clause" from the Deed of Trust and substitutes the following:

> In addition to the above-described indebtedness, this Deed of Trust shall, and does by these presents, secure: (1) any and all existing indebtedness or other obligations of the borrowers, or either of them, now held by lender, any and all extensions and renewals thereof regardless of amount or maturity, including the above-described indebtedness, and (2) any and all future indebtedness or other obligations regardless of amount or maturity which may hereafter be created by the borrowers, or either of them, and be held by lender, together with any and all extensions and renewals thereof regardless of amount or maturity, within a period thirty (30) years from date up to an amount not exceeding $61,232.08, whether said indebtedness or other obligation is evidenced by note or notes, draft, check, guaranty, or otherwise.

[*Id.* at ¶ 2].

---

[3] The record is unclear whether Notes Two and Three were for a new advance of funds or a refinancing of existing debt that was secured by the debtors' principal dwelling. The debtors have not raised any challenge to the security interest based on a violation of the Truth in Lending Act. *See* 15 U.S.C. § 1635 (a) and (e).

Note Two and Note Three are not directly referenced as secured indebtedness in the Modification. However, for purposes of this opinion, the court finds that Note Two and Note Three constitute "other obligations" of the borrowers as described in paragraph two of the Modification. [*See id.*]. The court finds that the parties' intention to secure these obligations with this real estate is also evident in the section entitled "collateral" in Note Two and Note Three. [*See id.* at 12, 14].

On June 24, 2016, the debtors filed a chapter 13 bankruptcy petition. [Doc. No. 1]. FNB filed one proof of claim covering all three notes claiming a total secured debt of $57,796.14. [Claim No. 2-1]. The debtors' Chapter 13 plan proposes to pay FNB $80 per month toward an arrearage of $3,800 and a maintenance payment of $516 per month for Note One only. [Doc. No. 2, at 1]. The plan proposes to treat Notes Two and Three as unsecured debts receiving a pro rata distribution. [*Id.* at 1-2]. The projected distribution would be insufficient to pay all unsecured claims including Notes Two and Three in full.

### III. Analysis

In its prior decision, the court analyzed how many liens FNB has against the debtors' residence first by considering the definitions of "lien," "security interest," and "claim" under the Bankruptcy Code and then by reviewing federal court precedent. *In re Poole*, 2017 WL 401799, at *3-5. Although FNB did not originally make the argument before this court, FNB argued to the district court that the number of liens it possesses should properly be determined by reference to Tennessee state law. The district court remanded for consideration of this issue. After reviewing FNB's supplemental brief on remand as well as the applicable caselaw, the court agrees with FNB that the extent of the lien it possesses should be determined by state law.

However, the court disagrees that a finding that FNB has only one lien should change the court's ultimate decision that Notes Two and Three may be modified.

### 1. FNB's property interest is determined by Tennessee law.

"Property rights are determined under the law of the state in which the real property is located . . . ." *Town Ctr. Flats, LLC, v. ECP Commercial II, LLC*, 855 F.3d 721, 724 (6th Cir. 2017) (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 136 (1979)). In *Butner*, the United States Supreme Court explained that:

> *Property interests are created and defined by state law*. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S. Ct. 347, 350, 5 L. Ed. 2d 323. *The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests*, including the interest of a mortgagee in rents earned by mortgaged property.

*Butner*, 440 U.S. at 55 (emphasis added).

In *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S. Ct. 2106, 124 L. Ed. 2d 228 (1993), discussed in more detail below, the Supreme Court determined the mortgage lender's rights according to state law. *Id.* at 329 ("The bank's 'rights,' therefore, are reflected in the relevant mortgage instruments, which are enforceable under [the relevant state] law."). The Sixth Circuit has consistently applied this principle as well, noting that "[i]n bankruptcy, just as in diversity, state substantive law defines the parties' underlying rights and obligations." *Sutherland v. DCC Litig. Facility, Inc. (In re Dow Corning Corp.)*, 778 F.3d 545, 550 (6th Cir. 2015).

Accordingly, the court finds it appropriate to determine FNB's rights in its mortgage documents according to Tennessee law. To the extent that the court previously determined the number of liens FNB possesses in the debtors' residence solely by reference to federal bankruptcy law, the court concludes that such a decision was in error.

**2. FNB has one lien under Tennessee law.**

In Tennessee, a "mortgage" is defined to include "a mortgage, deed of trust, or other conveyance of real property securing obligations . . . ." Tenn. Code Ann. § 47-28-101(a)(4); *see also Higdon v. Regions Bank*, No. E2009-01298-COA-R3-CV, 2010 WL 1924019, at *5 (Tenn. Ct. App. May 13, 2010). A mortgage may secure a future advance of funds:

> A mortgage may provide that it secures not only existing indebtednesses or advances made contemporaneously with the execution thereof, but also future advances, whether obligatory, or optional, or both, and whether made under open-end credit agreements or otherwise, to the same extent as if such future advances were made contemporaneously with the execution of the mortgage, even though no advance is made at the time of the execution of the mortgage and even though no indebtedness is outstanding at the time any advance is made.

Tenn. Code. Ann. § 47-28-102.

Tennessee law recognizes the general validity of so-called "dragnet clauses" in trust deeds. *In re Miller*, No. 12-33943, 2015 WL 2208369, at *9 (Bankr. E.D. Tenn. May 1, 2015) (citing *Duncan v. Claiborne Cnty. Bank*, 705 S.W.2d 663, 664 (Tenn. Ct. App. 1985)). In a case applying Tennessee law, this court described a dragnet clause as one "which, on its face, purports to include within the coverage of the deed of trust all present and future indebtedness owed by the borrower to the lender in addition to the specific debt being secured by the deed of trust." *In re Lemka*, 201 B.R. 765, 767 n.2 (Bankr. E.D. Tenn. 1996) (citing Milton Roberts, Annotation, *Debts Included in Provision of Mortgage Purporting to Cover all Future and Existing Debts*

*(Dragnet Clause) -- Modern Status*, 3 A.L.R. 4th 690, 694-95 n.3 (1981)). In Tennessee, dragnet clauses are provided for and enforced by statute:

> Any contract, security agreement, note, deed of trust, or other security instrument, in writing and signed or endorsed by the party to be bound, that provides that the security interest granted therein also secures other provisions or future indebtedness, regardless of the class of other indebtedness, be it unsecured, commercial, credit card, or consumer indebtedness, shall be deemed to evidence the true intentions of the parties, and shall be enforced as written; provided, that nothing herein shall limit the right of any party to contest the agreement on the basis that it was procured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts.

Tenn. Code Ann. § 47-50-112(b). "Tennessee courts recognize and enforce dragnet clauses so long as 'the language contained in the dragnet clause is plain and unambiguous. . . .'" *In re Miller*, 2015 WL 2208369, at *10 (quoting *In re Lemka*, 201 B.R. at 768); *see also Higdon*, 2010 WL 1924019, at *5 ("In Tennessee, future advance clauses in security instruments are recognized as valid and are enforceable according to their terms if the relevant language is plain and unambiguous.").

The dragnet clause at issue in this case is found first in the Deed of Trust, which provides:

> In addition to the above-described indebtedness, this Deed of Trust shall and does by these presents, secure: (1) any and all existing indebtedness or other obligations of the Borrowers, or either of them, now held by Lender, and all extensions and renewals thereof regardless of amount or maturity including the above-described indebtedness, and (2) any and all future indebtedness or other obligations regardless of amount or maturity which may hereafter be created by the Borrowers, or either of them, and be held by Lender, together with any and all extensions and renewals thereof regardless of amount or maturity, within a period twenty (20) years from date up to an amount not exceeding $61,232.08, whether said indebtedness or other obligation is evidenced by note or notes, draft, check guaranty, or otherwise.

[Claim 2-1, at 18]. The Modification executed by the parties on June 19, 2015, contains the same open-end mortgage provision. [*Id.* at 23]. The only relevant changes made were an extension of

the statute of limitations period from twenty to thirty years and updating the "Present Indebtedness" to reference the new balance owed. [*Id.*].

Based on these facts, the court concludes that FNB has one lien under Tennessee law, that which was created by the original Deed of Trust as modified on June 19, 2015. That one lien secures the amounts owed under Note One described as the "Present Indebtedness" and the "other obligations" evidenced by Note Two and Note Three.

### 3. FNB has multiple claims under the Bankruptcy Code.

Having made that correction in its analysis, the court will turn to the issue of whether the fact that FNB has only one lien produces a different result when viewed through the prism of bankruptcy law. The court again turns to the Bankruptcy Code to determine how the debtors' bankruptcy may affect FNB's interest vis-à-vis its lien. As the court previously noted, the Bankruptcy Code defines a lien as a "charge against or interest in property to secure payment of a debt or performance of an obligation." *In re Poole*, 2017 WL 401799, at *3 (quoting 11 U.S.C. § 101(37)). A "security interest" is defined as a "lien created by an agreement." 11 U.S.C. § 101(51). The court has determined that FNB has one lien, and thus one security interest, under state law which secures payment of all the debts owed to FNB. A "debt" is defined as "liability on a claim." *Id.* at (12). A "claim" in turn is defined as a "right to payment." *Id.* at (5). The Supreme Court has explained that the meaning of "debt" and "claim" are coextensive. *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558, 110 S. Ct. 2126, 2130, 109 L. Ed. 2d 588 (1990), *superseded on other grounds by statute*. A right to payment is "nothing more nor less than an enforceable obligation." *Cohen v. De La Cruz*, 523 U.S. 213, 219 (1998) (citation omitted).

The court previously found that FNB held three separate claims. The court's reasoning was that each note created an obligation to FNB and thus was a separate claim. The court notes that the district court previously signaled its agreement with the court's reasoning that FNB held three claims. [Case No. 4:17-cv-8, at Doc. No. 22, at 8-12]. The court concludes that the same result obtains in this case even after finding that FNB has one lien. Tennessee case law approving cross collateralization does not go so far as to consolidate separate obligations into one obligation. Cross collateralization allows the value derived from one lien to be spread across multiple obligations so far as the value goes. It may even allow one claim to improve its priority in the line of creditors looking to receive that value. *See, e.g., Home Fed. Bank, FSB, of Middlesboro, Ky. v. First Nat'l Bank of LaFollette, Tenn.*, 110 S.W. 3d 433, 437-40 (Tenn. Ct. App. 2002). It does not create more value when the value runs out.

**4. FNB's claims may be evaluated separately.**

The final question then, is whether FNB's claims may be considered separately for classification. Section 506(a) of the Bankruptcy Code defines the secured and unsecured components of debts according to the value of the underlying collateral:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. . . .

11 U.S.C. § 506(a).

Section 1322(b)(2) permits a Chapter 13 debtor's plan to "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). The "rights" of creditors referred to in section 1322(b)(2) are those rights provided under state law, including those "reflected in the

11

relevant mortgage instruments, which are enforceable under [the relevant state] law." *Nobelman*, 508 U.S. at 329.

In *Nobelman*, the Supreme Court considered whether, in a Chapter 13 case, an undersecured claim secured only by a mortgage on a debtor's principal residence could be bifurcated into its secured and unsecured components. The debtors in *Nobelman* sought to "strip down" the mortgage lender's secured claim of $71,335 to the home's value of $23,500. *Id.* at 326. The Supreme Court determined that a Chapter 13 debtor should first look "to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim." *Id.* at 328. If the valuation reveals that a claim has a "secured component," the debtor may not use section 1322(b)(2) to modify the lien. *Id.* at 331. The Supreme Court held that "§ 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence." *Id.* at 325-26. Although the Supreme Court acknowledged that section 506(a) allows bifurcation of claims into secured and unsecured components, the Court interpreted section 1322(b)(2) as protecting even the unsecured components of a partially secured claim. *See id.* at 330-32. Thus, if the section 506(a) valuation establishes that the claim has a secured component, then section 1322(b)(2) cannot be used to modify the lien. *Id.* at 332. If the existence of separate notes creates multiple rights to payment, *Nobelman* directs the court to consider whether the lien has any value to support the claim. If there is no value, the claim is wholly unsecured and may be modified.

In *Lane v. Western Interstate Bancorp (In re Lane)*, 280 F.3d 663 (6th Cir. 2002), the Sixth Circuit considered "whether the implications of *Nobelman* would bar modification of the rights of a creditor who, although the holder of a lien on the Chapter 13 debtor's homestead, has solely an 'unsecured claim' under § 506(a)." *Id.* at 664. The *Lane* debtors sought through their

12

Chapter 13 plan to modify the rights of a second mortgagee whose lien on the debtors' homestead was wholly unsecured. *Id.* at 665. Applying the principles of *Nobelman*, the *Lane* court began its analysis by looking first to section 506(a) to determine whether the lender's claim was properly classified as "secured" or "unsecured." *Id.* at 667-69. The *Lane* court explained that such an approach "means that it must make a difference whether the overall claim belongs in the pigeonhole marked 'secured claims' or the pigeonhole marked 'unsecured claims,' as those terms are defined in § 506(a)." *Id.* at 667. The *Lane* court found that "the only apparent reason why the classification could make a difference is that the special protection accorded by the antimodification provision [of § 1322(b)(2)] extends to the rights of holders of 'secured claims' and does not extend to the rights of holders of 'unsecured claims.'" *Id.* at 668.

> The *Lane* court explained:
>
> It is important, in this connection, to remember that just as "secured claims" is a term of art in the bankruptcy code (see *Nobelman,* 508 U.S. at 331, 113 S. Ct. 2106, where the Supreme Court so described the term), "unsecured claims" is a term of art too. Courts subscribing to the minority position often ignore this; they proceed as if the phrase "holders of unsecured claims" meant nothing more than claimants without any liens. But when Congress divided the universe of claimants into those with "secured claims" and those with "unsecured claims," it was not merely distinguishing between claimants possessed of security interests and claimants not possessed of such interests. Insofar as claimants with homestead liens are concerned, rather, the dividing line drawn by § 1322(b)(2) runs between the lienholder whose security interest in the homestead property has some "value," see § 506(a), and the lienholder whose security interest is valueless.

*Id.*

The second mortgagee in *Lane* possessed a claim that was wholly unsecured or, in other words, a lien that had no value. *Id.* Thus, the court determined that the second mortgagee held an unsecured claim and that "the rights of a creditor holding such a claim 'may' be modified by the debtors' Chapter 13 plan." *Id.* According to *Lane*, in the Sixth Circuit, a wholly unsecured junior lien on a debtor's principal residence is not protected from modification by section 1322(b)(2).

13

The *Lane* court set forth the following template for considering whether a lien on a debtor's principal residence may be modified under section 1322(b)(2).

— Section 1322(b)(2) prohibits modification of the rights of a holder of a secured claim if the security consists of a lien on the debtor's principal residence;

— Section 1322(b)(2) permits modification of the rights of an unsecured claimholder;

— Whether a lien claimant is the holder of a "secured claim" or an "unsecured claim" depends, thanks to § 506(a), on whether the claimant's security interest has any actual "value;"

— If a claimant's lien on the debtor's homestead has a positive value, no matter how small in relation to the total claim, the claimant holds a "secured claim" and the claimant's contractual rights under the loan documents are not subject to modification by the Chapter 13 plan;

— If a claimant's lien on the debtor's homestead has no value at all, on the other hand, the claimant holds an "unsecured claim" and the claimant's contractual rights are subject to modification by the plan.

*Id.* at 669.

FNB's argument disregards the significance of starting by analyzing each claim and focuses only on whether the lien has value for any one of FNB's claims. If it does, then FNB argues that any debt that can be dragged under the net of that lien cannot be modified no matter how independent it is of other obligations or unlikely it is to be supported by any value from the collateral. Both *Nobelman* and *Lane* start with the claim and look to determine what actual value the lien provides toward repayment of the claim. The court finds that in this case, FNB contracted with the debtors in the Deed of Trust that the proceeds of any sale would be applied to the Present Indebtedness first. [Claim 2-1, at 20-21]. The parties have also stipulated that the value of the property is less than the balance due under Note One. Thus, there is no "actual value" to support Note Two and Note Three. They are wholly unsecured.

FNB argues that the court should reach a different conclusion because there is only one mortgage document. FNB contends that there is only one lien against the debtors' residence, and, because that lien has economic value, the lien may not be bifurcated. Under that theory, the issuance of separate notes is immaterial, and the existence of one security document is paramount. In support of this position, FNB relies heavily on *Nobelman* and *Lane*. However, neither case addressed a factual situation exactly like the one presented here. In *Nobelman*, the Supreme Court addressed a situation with one note holder secured by a lien created by one mortgage instrument. In *Lane*, there were two different note holders, each secured by a lien created by its own mortgage instrument. Here, the debtors have multiple notes with the same creditor, secured by a security interest in real estate evidence by one deed of trust that prioritizes the use of proceeds to satisfy the obligations.

In addressing FNB's argument in its prior opinion, the court noted the following reasoning from *Nobelman* regarding the importance of a "unitary note":

> Petitioners propose to reduce the outstanding mortgage principal to the fair market value of the collateral, and, at the same time, they insist that they can do so without modifying the bank's rights "as to interest rates, payment amounts, and [other] contract terms." That appears to be impossible. *The bank's contractual rights are contained in a unitary note that applies at once to the bank's overall claim, including both the secured and unsecured components. Petitioners cannot modify the payment and interest terms for the unsecured component, as they propose to do, without also modifying the terms of the secured component.* Thus, to preserve the interest rate and the amount of each monthly payment specified in the note after having reduced the principal to $23,500, the plan would also have to reduce the term of the note dramatically. That would be a significant modification of a contractual right.

*Nobelman*, 508 U.S. at 331 (internal citations omitted) (emphasis added). While not explicit, the highlighted sentences indicate that the Supreme Court might have gone the other way had the bank's contractual rights been contained in multiple notes, because it would have then been possible to modify the terms of a wholly unsecured note without affecting any rights provided by

15

the secured note. The court continues to find the Supreme Court's reasoning persuasive. In its prior opinion, the district court signaled its approval of this reasoning. [Case No. 4:17-cv-8, at Doc. No. 22, at 13-15]. Even on appeal and reconsideration, FNB has not demonstrated how modification of the contractual terms of Notes Two and Three, for which the lien provides no actual value, would modify the rights of FNB under Note One or the Deed of Trust.

### IV. Conclusion

Under the current stipulation of value, the court finds that debtors may modify the terms of Notes Two and Three. The court overrules the objection of FNB to the plan based on its contention that modification is prohibited. The parties reserved the right to hold a hearing on valuation should the court overrule FNB's objection as to bifurcation. Accordingly, the court will proceed with the valuation hearing. Should the court find that the value is more than $44,000, the Debtors must be prepared to prove the priority of Notes Two and Three if they still seek to treat either note as an unsecured claim. The court will enter a separate order to set an evidentiary hearing on the value of the residential property to determine whether the plan properly provides for the claims based on Notes Two and Three.

###